**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**MARCELLA AARON**                                                                    **PLAINTIFF**

**v.**                                       **Case No. 5:16-CV-05055**

**CITY OF SPRINGDALE**                                                              **DEFENDANT**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Currently before the Court are Defendant City of Springdale's ("Springdale") Motion for Summary Judgment (Doc. 19), Statement of Facts (Doc. 20), and Brief in Support (Doc. 22); Plaintiff Marcella Aaron's Response in Opposition (Doc. 25) and Response to Statement of Facts (Doc. 24); Springdale's Reply (Doc. 26) and Reply to Statement of Facts (Doc. 27); and Mr. Aaron's Sur-Reply (Doc. 29). The Motion is now ripe for decision, and for the reasons stated herein, is **GRANTED**.

## I. BACKGROUND

This lawsuit arises from Plaintiff Marcella Aaron's claims of race discrimination in the workplace, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*, and the Arkansas Civil Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-101, *et seq.* The Amended Complaint (Doc. 15) states a claim for a hostile work environment due to race-based harassment, and a claim for race discrimination resulting in constructive discharge. Both claims were addressed in the briefing on Springdale's Motion for Summary Judgment, and both will be discussed in this Order. As a preliminary matter, the Court observes that claims made under Title VII and the ACRA are evaluated using the same standards. *See McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860 (8th

Cir. 2009). The Court will therefore analyze the federal claims together with the state claims.

This case involves a series of incidents that took place in the Public Works Department of Springdale over an approximately two-year period. The timeline begins on June 5, 2012, when Mr. Aaron, an African-American male, was hired as a part-time Maintenance I worker in the Public Works Department. He remained in that position until January 14, 2013, when he was hired on, full-time, as a Maintenance II worker, a job that involved primarily mowing and brush-hogging on a tractor or rotary mower, and working with the concrete crew. His pay increased when he started working full-time. He also received a Personnel and Procedures Manual ("Manual"), which he admits to having read and understood at the time he received it. The Manual discusses, among other topics, the issue of harassment in the workplace and describes several types of disciplinary actions that Springdale could take against an employee who harassed another employee, depending on the severity of the offense and the offending employee's prior history. *See* Docs. 20-40, 20-41. According to the Manual, "harassment based on race, religion, color, sex, national origin, age, handicap, or status as a veteran or special disabled veteran . . . . WILL NOT BE TOLERATED"; and "[a]n employee should report harassment or suspected harassment to their immediate supervisor, or another supervisor within their department, or the department head, or the Mayor." (Doc. 20-41, p. 1).

At all relevant times, Sam Goade served as the Director of Springdale's Public Works Department; Terry Anderson served as supervisor of the General Construction Division of the Public Works Department; and James Carr served as Supervisor of the Street Construction Division of the Public Works Department. As Mr. Aaron was an

employee of the Street Construction Division, he reported directly to Mr. Carr, who reported to Mr. Anderson, who reported to Mr. Goade—and Mr. Goade reported directly to the Mayor.

On or about January 29, 2013, about two weeks after Mr. Aaron started working full-time, he was standing on a bench outside with his co-worker Troy Flood, who is Caucasian. Another co-worker named Chuck Harris drove up alongside Mr. Aaron and Mr. Flood and said to Mr. Aaron, "Boy, you look good up there . . . the only thing missing is a rope around your neck," and then drove away. (Dep. Marcella Aaron, Doc. 24-1, p. 11). Mr. Aaron believed the comment to be racial in nature but did not report it to a supervisor immediately. Instead, Mr. Flood reported the comment to Mr. Anderson, because he believed the comment was racist. Mr. Anderson then reported the incident up the chain of command to Mr. Goade, who advised Mr. Anderson to seek out Mr. Aaron and confirm that the statement was made, and then inquire whether Mr. Aaron found it offensive and wished to discuss it in Mr. Goade's office. Mr. Goade next informed Human Resources Director Loyd Price and Mayor Doug Sprouse of the incident and advised them that he was investigating the issue.

Mr. Goade eventually sought out Mr. Aaron himself so that he could speak with him directly about the comment. Mr. Goade told Mr. Aaron that he had spoken to Mr. Harris, the person who made the comment, and told Mr. Harris that he was not to speak in that manner again. Mr. Goade further assured Mr. Aaron that he would not tolerate any racism or prejudice from any employee in the Public Works Department, and that Mr. Aaron should come to him if any issues of this nature occurred while he was working for Springdale. The incident was documented in Mr. Harris's personnel file, and Mr. Harris

apologized to Mr. Aaron.  Mr. Aaron agrees that Mr. Harris never made any other racially-charged comments in the workplace after that.

Sometime later in 2013, Mr. Aaron was present during a conversation between Mr. Flood, and another co-worker named Tim Burton.  The men were pouring concrete at a work site.  The mud and concrete had started to harden at one point into small balls, and Mr. Burton commented to Mr. Flood that "back in the day, we called these nigger balls." *Id.* at 12.  Mr. Aaron told Mr. Burton that he did not appreciate that comment, and Mr. Burton responded by saying that he was "just playing."  *Id.*

On another occasion in 2013, the same men were standing outside the break room. Mr. Flood lit a cigarette for Mr. Burton, and after it was passed to Mr. Burton, he examined the cigarette and said that Mr. Flood had "nigger lipped" it.  *Id.*  Mr. Aaron again confronted Mr. Burton, asking him, "What did you say?"  *Id.* at 13.  And Mr. Burton replied that he didn't know Mr. Aaron had been standing there.  *Id.*

The next incident involved comments made by both Mr. Flood and Mr. Burton, which Mr. Aaron overheard as he was coming up the stairs to the break room.  On that day, a truck carrying an African-American woman and a Hispanic man pulled into the Public Works yard.  The men observed the truck, and Mr. Aaron heard Mr. Burton say, "what is that beaner doing with that nigger," and Mr. Flood laughed.  *Id.*  Then Mr. Flood asked, "what would you rather have in your yard?  A beaner or a dog turd?" and then answered his own question, stating, "well, a dog turd eventually turns white and stops stinking."  *Id.* Mr. Burton then commented that "these immigrants were driving better trucks than the white man."  *Id.*  After this last comment, Mr. Aaron asked Mr. Burton what he meant by it, but Mr. Burton did not respond.

4

Some time passed, and in 2014, Mr. Aaron, Mr. Burton, and Mr. Flood were all sitting in the break room playing dominoes with several other Public Works employees. Mr. Flood began speaking about his new, white pitbull, who only liked to kill black things, like black squirrels and blackbirds. Mr. Burton then asked Mr. Flood, "well, was the black squirrel named Marcella?"—referring to Mr. Aaron. *Id.* at 14. At that point, Mr. Aaron turned to Mr. Burton and told him he had "one more time to disrespect [him] like that," and then Mr. Aaron would "have to find some kind of way to get him addressed." *Id.* Supervisors Carr and Anderson were in the break room at the time, and Mr. Anderson was seated at the table directly behind Mr. Aaron; however, Mr. Aaron was not sure whether either supervisor heard the entire exchange. *See id.* at 15.[1] Mr. Aaron testified that he and Mr. Burton "confronted each other right then and there" after that and "had words." *Id.* at 14. But Mr. Aaron admits that he did not report the incident to a supervisor. *See id.* at 15.[2]

On April 2, 2014, Mr. Flood agreed to drive Mr. Aaron back to the Public Works yard so that Mr. Aaron could meet a family member for lunch. After pulling into the yard, Mr. Burton and his brother, who was also an employee of the Department, stopped Mr. Flood and asked him where he was going. Mr. Flood responded, "I was supposed to be going

---

[1] The deposition transcript at Doc. 24-1, p. 15, reads as follows: "**Q: Do you know if [Mr. Carr and Mr. Anderson] heard the exchange?** A: I can't say, but I know Terry [Anderson] was sitting at a table right behind us. **Q: He was sitting at the table behind you but you can't say one way or the other if he heard the exchange?** A: Correct."

[2] The deposition transcript at Doc. 24-1, p. 15, reads as follows: "**Q: Did you affirmatively go to Mr. Anderson, or Mr. Carr, Mr. Goade and say hey, Tim and Troy are making comments again?** A. Not at that moment, no."

to eat, but I got to go drop this Negro off first." *Id.* at 15. Mr. Aaron reached up to punch Mr. Flood, but then thought better of it and simply got out of the truck. He said to Mr. Burton, "enough is enough. I think I've took too much of this shit without acting violent or doing anything stupid, but I'm tired of asking all you guys to be civil. I'm going to handle this my way." *Id.* Then Mr. Aaron went to his supervisor, Mr. Carr, and asked him if he could take the rest of the day off, as well as the following day. Mr. Carr agreed, but asked Mr. Aaron why he wanted to leave, and Mr. Aaron responded that he was "tired of being called a nigger." (Doc. 20-17). Mr. Carr asked who had called him that word, and Mr. Aaron refused to answer. Mr. Carr then suspected that the guilty party might be Mr. Flood, so Mr. Carr confronted him directly and asked about the incident. The undisputed testimony is that Mr. Flood then "blew up" at Mr. Carr and denied that he had called Mr. Aaron "nigger," but admitted he had instead called him "Negro." *Id.* Mr. Carr instructed Mr. Flood to stop the comments, or he could be fired.

Immediately after the "Negro comment" incident took place, Mr. Carr reported it to Mr. Goade, who in turn reported it to Human Resources Director Gina Lewis.[3] The following day, April 3, 2014, Mr. Goade asked Mr. Aaron to participate in a meeting involving himself, Mr. Carr, Mr. Anderson, and Ms. Lewis, to discuss the "Negro comment." At the meeting, Mr. Aaron also mentioned Mr. Burton's and Mr. Flood's comments and jokes about the African-American woman and Hispanic man. Mr. Goade reminded Mr. Aaron that he would not tolerate those sorts of comments and instructed Mr. Aaron to let him or the other supervisors know immediately if there were any more problems. Ms.

---

[3] The Court understands that, at some point, Ms. Lewis succeeded Mr. Price as Human Resources Director.

Lewis also told Mr. Aaron that she was sorry he was having to go through all of this and advised him that she was going to come up with a plan to keep it from happening again.

After meeting with Mr. Aaron on April 3, the three supervisors and Ms. Lewis met with Mr. Flood, who confirmed that he had called Mr. Aaron "this Negro" at one point, and also that he had made racially-charged comments and jokes in Mr. Aaron's presence about an African-American woman and a Hispanic man. Mr. Goade and Ms. Lewis explained to Mr. Flood that this type of joking was inappropriate and a violation of Springdale's harassment policy, and further, that they would be in touch regarding disciplinary action. The next day, April 4, 2014, Mr. Goade drafted a disciplinary notice, which was approved by Ms. Lewis, and issued in writing to Mr. Flood.

Also on April 3, 2014, Mr. Burton and his brother were interviewed by the same group of supervisors, and Mr. Burton agreed that the comments and jokes about the African-American woman and Hispanic man had been made and were inappropriate. Ms. Lewis advised Mr. Burton that he would receive a written warning in his personnel file, but in the end, she only gave him a verbal warning. After the meeting with Mr. Burton and his brother, Mr. Goade and Ms. Lewis met to discuss the need for diversity training for the Public Works Department, and on that same day, Ms. Lewis began putting together harassment and diversity training materials and identified two possible dates to conduct the training. Mr. Goade selected April 16, 2014, as the day to conduct the training, and Ms. Lewis posted a notice about the training, which would be mandatory for all Public Works employees to attend.[4]

---

[4] The parties agree that the diversity training actually took place on April 16, 2014. During the training, Ms. Lewis explained to the employees the definition of "harassment," reviewed

Mr. Aaron returned to work on Monday, April 7, 2014.  Around that time, Mr. Aaron went out to lunch with Mr. Flood, trying to make amends.  They went to a Mexican restaurant. When a Hispanic man entered the restaurant, Mr. Aaron mentioned to Mr. Flood that the Hispanic man's car had a number "6" on it, and Mr. Aaron mused that the man "must race"—as in, must race cars.  (Doc. 24-1, p. 18).  Mr. Flood responded that the man was "barely in the human race."  *Id.*  Mr. Aaron found the comment offensive.

On April 15, 2014, the day before the scheduled diversity training, Mr. Aaron was sitting in the break room, and an employee named Dennis Sinclair approached him from behind and said, apparently in reference to Mr. Aaron's untucked shirt, "Boy, you need to put your shit in your pants.  You look like a fucking thug."  *Id*. at 17.  After this exchange, Mr. Aaron went to his supervisor, Mr. Anderson, who was also present in the break room, and told him that he was quitting.  Mr. Anderson denies hearing the specific comment that was said to Mr. Aaron in the break room, as there were approximately ten other people in the room at the same time, talking and making noise.  Mr. Anderson then reported to Mr. Carr that Mr. Aaron was quitting, and Mr. Carr immediately ran out to Mr. Aaron's car to catch him before he left and ask him what was wrong.  Mr. Aaron informed Mr. Carr that he felt unwanted by the crew he worked with, but mentioned no specific names.  Mr. Carr then asked Mr. Aaron to reconsider quitting, but Mr. Aaron refused, stating he had made his decision.  Both Mr. Carr and Mr. Anderson then went to Mr. Goade to tell him that Mr. Aaron had quit.  The following day, April 16, 2014, Ms. Lewis attempted to call Mr. Aaron,

_____

the harassment-reporting requirements, discussed the consequences for those who engage in harassing behavior, reviewed Springdale's harassment policy, and presented a PowerPoint on the subject of diversity.

but she dialed the wrong phone number and was unable to reach him. The parties agree that with respect to Mr. Aaron's on-the-job performance, he was an above-average employee, and none of his supervisors wanted him to quit. He was described by Mr. Carr in an October 2013 performance evaluation as a "good worker" who was "willing to learn more." (Doc. 20-8). Mr. Aaron received a pay increase for his job performance on December 12, 2013, and he was never disciplined during his tenure at the Public Works Department.

## II. LEGAL STANDARD

### A. Summary Judgment

The standard of review for summary judgment is well established. Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). In order for there to be a genuine issue of

material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## B.  Hostile Work Environment

"A hostile environment exists when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Establishing a prima facie case of hostile work environment requires proof of the following elements: (1) membership in a protected class; (2) unwelcome harassment; (3) a causal connection between the harassment and the protected status; and (4) proof that the harassment affected a term, condition, or privilege of employment. *Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006) (citing *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005)).

If the above four factors are established, then the court must turn to the question of whether the perpetrators of the harassment were co-workers or supervisors, as liability may depend on the employment status of the harasser.  *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).  An employer is strictly liable for the actions of a supervisor who

harasses an employee, if such harassment "culminates in a tangible employment action." *Id.* For purposes of this inquiry, a supervisor is defined as someone who is "empowered by the employer to take tangible employment actions against the victim," such as "the power to hire, fire, demote, promote, transfer, or discipline." *Id.* On the other hand, if a victim alleges that a non-supervisory employee harassed him, then the victim must establish that the employer "knew or should have known about the harassment and failed to take proper action." *Gordon*, 469 F.3d at 1195.

The Eighth Circuit considers that when harassment is at the hands of a co-worker, rather than a supervisor, a fifth prima facie element must be established: that the employer knew or should have known about the harassment and failed to take proper action. *See Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005). If, however, a plaintiff establishes that a supervisor perpetrated the harassment, then the employer will be vicariously liable for the supervisor's conduct unless the employer can establish it is entitled to the benefit of the *Ellerth/Faragher* affirmative defense. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). The affirmative defense contains two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765.

## C. Race Discrimination Due to Constructive Discharge

A claim of race discrimination requires proof that the victim: (1) is a member of a protected class; (2) was meeting his employer's expectations; (3) suffered an adverse

employment action; and (4) was treated differently than similarly situated employees who were not members of his protected class. *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013). A constructive discharge may constitute an "adverse employment action," under the third part of this test. *Id.* However, a claim for constructive discharge due to a hostile work environment requires "something more" than proof of the hostile work environment alone. *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1132 (8th Cir. 2014) (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004)). In fact, "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Penn State*, 542 U.S. at 149. Accordingly, if a hostile work environment claim fails, then a "claim of constructive discharge must also fail." *Resters*, 739 F.3d at 1132. Constructive discharge requires proof that a reasonable person in the employee's situation would find the working conditions intolerable, and also that the employer intended to force the employee to quit. *Id.* "An employee must, however, grant [his] employer a reasonable opportunity to correct the intolerable condition before [he] terminates [his] employment." *Id.* (quotation and citation omitted).

## III. DISCUSSION

### A. Hostile Work Environment

In order to assess whether Mr. Aaron's hostile work environment claim should survive summary judgment, the Court has set forth below the list of alleged racial slurs, jokes, and comments that the parties agree are at issue, as well as the approximate dates on which they occurred. They are as follows:

(1)     January 29, 2013:  Chuck Harris's comment to Mr. Aaron that "the only thing missing is a rope around your neck."

(2)     Sometime after January of 2013: Tim Burton's comment to Troy Flood about calling concrete balls "nigger balls."

(3)     Sometime after January of 2013: Mr. Burton's comment to Mr. Flood about having "nigger lipped" a cigarette.

(4)     Sometime after January of 2013: Mr. Burton's and Mr. Flood's comments and jokes regarding an African-American woman and Hispanic man who had just pulled into the Public Works yard, including "what is that beaner doing with that nigger"; "what would you rather have in your yard?  A beaner or a dog turd?"; "well, a dog turd eventually turns white and stops stinking"; and "these immigrants were driving better trucks than the white man."

(5)     Sometime in 2014: Mr. Burton's question, "well, was the black squirrel named Marcella?" in reference to Mr. Flood's white pitbull hunting and killing only black animals.

(6)     April 2, 2014: Mr. Flood's reference to Mr. Aaron as a "Negro," in telling Mr. Burton, "I was supposed to be going to eat, but I got to go drop this Negro off first."

(7)     Sometime after April 2, 2014:  Mr. Flood's reference to a Hispanic man in a restaurant as "barely in the human race."

(8)     April 15, 2014: Dennis Sinclair's comment to Mr. Aaron,  "Boy, you need to put your shit in your pants.  You look like a fucking thug."

First, it must be acknowledged that none of the above comments belong in the workplace (or anywhere in a civilized society).  The racial insensitivity evidenced by these

remarks ranges from very distasteful to palpably offensive. However, the legal standard for establishing a claim of hostile work environment is demanding, and only "extreme conduct[,] rather than merely rude or unpleasant conduct," will constitute harassment. *Rester*, 739 F.3d at 1131 (quotation and citation omitted). The Court is deeply troubled by the incidents of harassment detailed above. At the same time though, the Court recognizes that Eighth Circuit precedent, which, as will be explained in greater detail below, erects a high barrier to an employee seeking to survive summary judgment.

### 1. Were the Comments Sufficiently Severe or Pervasive?

Turning to the prima facie elements, the parties agree that Mr. Aaron has established the first three: (1) that he is a member of a protected class due to his race, (2) that he suffered unwelcome harassment, and (3) that a causal connection existed between the harassment and his protected status. Where the parties differ is in their interpretation of the fourth element of the prima facie case, which asks whether the harassment was so severe or pervasive that it affected a term, condition, or privilege of employment.

Springdale does not dispute that the unwelcome comments and jokes Mr. Aaron was subjected to were offensive. Springdale argues instead that the number of comments over the course of a two-year period of employment, as well as the nature of these comments, are not demonstrably severe or pervasive enough to create a hostile work environment. Mr. Aaron responds that the totality of these comments, jokes, and slurs indicates that there was an "insidious and racially discriminatory culture that obviously pervaded the Public Works Department." (Doc. 25, p. 3). And, further, that the measures that Springdale took to correct the behavior of its employees were inadequate, as none of the harassers were terminated or suspended once the supervisors found out about the offensive comments, jokes, and slurs.

The Eighth Circuit in *Singletary v. Missouri Department of Corrections* explained that

> [t]o decide whether a work environment is objectively offensive, that is, one which a reasonable person would find hostile or abusive, we examine all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance.

423 F.3d 886, 892-93 (8th Cir. 2005). Using this standard, the Court finds that two of the incidents complained of by Mr. Aaron could be characterized, potentially, as physically threatening, and the Court will address those first.

### a. Potentially Threatening Comments

The earliest incident on the list, which the Court also views as the most serious, occurred shortly after Mr. Aaron started full-time with Springdale, when Chuck Harris made the "rope around your neck" comment. However, this comment occurred one time, and it was immediately addressed by supervisory personnel. Mr. Harris was disciplined, and the incident was documented in his personnel file. Further, Mr. Harris apologized to Mr. Aaron, Mr. Aaron accepted the apology, and Mr. Harris never made any other comments to Mr. Aaron that he considered racist or racially-motivated. Under these circumstances, if the "rope around your neck" comment created a hostile work environment for Mr. Aaron, there is no genuine, material dispute of fact that Springdale's disciplinary action ended the harassment by that particular employee.

The second comment that could possibly be classified as physically threatening was one in which Mr. Burton compared Mr. Aaron to a black squirrel. The context for this comment was that Mr. Flood had mentioned that his pitbull like to hunt and kill black things, such as black squirrels and blackbirds. Though this comment is certainly inappropriate and tasteless, it is not one that an objective observer would regard as a true threat of serious

bodily harm, viewing all the surrounding circumstances in the light most favorable to Mr. Aaron. By way of comparison, the Eighth Circuit in *Jackson v. Flint Ink North American Corp.* found that graffiti on a bathroom wall linking an employee's name to a drawing of a burning c and a KKK sign was an example of a threat of serious bodily harm, at least sufficient to survive summary judgment. 382 F.3d 869, 870 (8th Cir. 2004). And the Court in *Reedy v. Quebecor Printing Eagle, Inc.* similarly found that an employee had suffered a specific threat of harm when he demonstrated that his name had been written in a workplace bathroom alongside the statements, "all niggers must die," and "kill all niggers." 333 F.3d 906 (8th Cir. 2010). The "black squirrel" comment is, by contrast, not analogous to these more serious examples from the caselaw, by any reasonably objective measure.

### b. Racial Slurs and Specifically Directed Racial Epithets

As for the six other comments/incidents Mr. Aaron has complained of, four of them involved the use of racial slurs uttered in Mr. Aaron's presence and/or that Mr. Aaron overheard. These four comments included calling concrete balls "nigger balls," observing that someone "nigger lipped" a cigarette, joking about Hispanics and African-Americans by referring to them as "beaners" and "niggers," and opining that a Hispanic man in a restaurant was "barely in the human race." The last two comments were racial epithets directed to Mr. Aaron personally, including calling him "this Negro" on one occasion, and "boy" and "thug" on another occasion.

### c. Application of Eighth Circuit Precedent

The Eighth Circuit's decision in *Singletary* provides a factually analogous comparison to this case, in which an African-American male was subjected to hearing employees refer generally to African-Americans as "niggers"; an employee and a supervisor refer to him specifically as a "nigger and a "nappy headed little nigger"; the staff

posting a picture of Aunt Jemima in the workplace during Black History Month; and an incident of vandalism done to the plaintiff's vehicle while it was parked at the workplace, which the plaintiff believed to be racially motivated. 423 F.3d at 888-890. The *Singletary* Court, in affirming the district court's grant of summary judgment, noted that the use of racial slurs in the workplace, without more, "do not render a work environment hostile as a matter of law." *Id.* at 893. The Court elaborated as follows:

> Racial epithets are morally repulsive. But our cases require that a plaintiff show more than a few occurrences over a course of years. To be actionable, such conduct must be shown to occur with such frequency that the very conditions of employment are altered and be viewed by a reasonable person as hostile.

*Id.* The Court then compared the facts in *Singletary* to those in *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759-60 (8th Cir. 2004), a case in which the Court also affirmed summary judgment in the employer's favor, despite the fact that Mr. Bainbridge overheard multiple offensive racial epithets uttered by the owners of the business over the course of two years—including the words "Jap," "nip," and "gook" approximately once a month (though the plaintiff had informed the owners that his wife was Japanese, and he found those terms offensive), and "spic," "wetback," "monkey," and "nigger" at other times, with respect to other racial minorities. Further, Mr. Bainbridge believed that he was discharged because he complained about these words being used in the workplace. *Bainbridge*, 378 F.3d at 758.

The *Singletary* Court found that the racial epithets Mr. Singletary had been subjected to were "no more severe than those facts referred to in *Loffredo Gardens*" and focused on: (1) the frequency of the epithets and (2) whether the epithets were directed to the plaintiff, or instead directed to others and overheard by the plaintiff. In making these distinctions, the *Singletary* Court contrasted the facts in its case, involving what it described

as "a few occurrences over a course of years," and the facts in another example case, *v. Douglas Cnty., Ne.*, 234 F.3d 391 (8th Cir. 2000), involving "a supervisor's *constant* use of racial epithets *towards* a black employee." *Singletary*, 423 F.3d at 893 (emphasis added). *See also Elmahdi v. Marriott Hotel Servs.,* Inc., 339 F.3d 645, 653 (8th Cir. 2003) (affirming district court's judgment as a matter of law in favor of employer, after a jury trial, on the issue of hostile work environment, when the plaintiff was called "boy" and "black boy" on a few occasions over a period of years, and his supervisor once referred to Africans as having big penises, and noting that, "[w]hile offensive, the statements do not constitute a "steady barrage of opprobrious racial comment" sufficient to support a . . . hostile work claim"); *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 844 (8th Cir. 2002) (finding no hostile work environment over a four-year period of employment, where the conduct included three incidents of racial epithets directed to the plaintiff, two incidents of racial epithets directed to other African-American employees, the dissemination of a poem with racist messages, and racist graffiti and drawings on the bathroom wall).

The frequency of the incidents of alleged racial slurs or epithets is one consideration that the Eighth Circuit finds meaningful when determining whether a fact question exists as to a hostile work environment claim. In looking at the issue of frequency, however, courts must not consider each incident in isolation but should instead take into account "the totality of the circumstances." *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 942 (8th Cir. 2010). A situation in which racial jokes and innuendo are "bandied about the workplace with no particular target" is different than pointed, hostile comments made directly to an employee, in a manner that would be "particularly demeaning or humiliating." *Id.* at 943 (quoting *Delph v. Dr. Pepper Bottling Co. of*

*Paragould, Inc.*, 130 F.3d 349, 356 (8th Cir. 1997)).  To find that comments made in the workplace are pervasive enough to affect a term, condition, or privilege of employment, the plaintiff must demonstrate that the work environment was both objectively and subjectively hostile; that is, that the workplace was one that a reasonable employee *and* the victim would both view as hostile.  *Reedy*, 333 F.3d at 908.  A case that the Eighth Circuit cites to as an example of both an objectively and subjectively hostile workplace is *Delph*, 130 F.3d at 349.  In *Delph*, the Court upheld a jury verdict in favor of African-American employee on his hostile work environment claim, where the evidence indicated that, "on a regular basis," one of his supervisors called him "black boy," rather than use his  true name—both at sales meetings and in front of co-workers; and another supervisor called him "nigger," "black boy," "token black boy," and "my little black boy."  *Id.* at 352.[5]

### d.  Borderline Case

By contrast, the list of eight harassing comments/incidents presented by Mr. Aaron creates what the Court would term a borderline case, at best, of a racially based hostile work environment, in view of Eighth Circuit precedent. Eight comments/incidents, over the

---

[5] Fact patterns presented to the Eighth Circuit nearly twenty years ago—such as those present in *Delph* (1997), as well as in *Ross v. Douglas County, Nebraska*, 234 F.3d 391, 396-97 (8th Cir. 2000)—continue to define the required level of severity or pervasiveness necessary to permit a district court to submit claims of racially hostile work environments to a jury. Surveying the Eighth Circuit's body of law on this topic, the recurring notion (in cases of co-worker created hostility) is that an employee must have endured a steady stream of personally-directed racial epithets over the course of months, if not years, in order to survive summary judgment. *See, e.g., Watson v. Heartland Health Labs., Inc.*, 790 F.3d 856 (8th Cir. 2015) (observing that a single use of a racial slur "does not amount to the 'stream of racial slurs' in other cases where we have found a hostile work environment," and citing to *Delph*).  This begs the question of whether the standard by which racial insensitivity in the workplace is tolerated should evolve with time—and if so, should  the minimum degree of required severity and/or pervasiveness necessary to state a jury question likewise evolve?  But regardless of the answers to those questions, the Court here is duty-bound to follow existing precedent.

course of two years of employment, could meet the threshold for establishing a hostile environment if those incidents were severe or pervasive—as in severely threatening, humiliating, and demeaning—and if the incidents were mainly directed to Mr. Aaron personally, as opposed to being general epithets "bandied about the workplace with no particular target." *Delph*, 130 F.3d at 356. In viewing the eight incidents in a light most favorable to Mr. Aaron, it appears that four of them—or half—were general epithets or jokes that Mr. Aaron overheard, but were not directed to him specifically; and the other four were directed to him. The ones directed to him included the "rope around your neck" comment, the "black squirrel" comment, the "this Negro" comment, and the "boy, you need to put your shit in your pants" comment. Since the Eighth Circuit has affirmed summary judgment in the employer's favor on facts far more egregious than the ones present here, the Court finds that Mr. Aaron has failed to satisfy the fourth element of his prima facie case, and as a matter of law, the harassment he experienced was not severe and pervasive enough to affect a term, condition, or privilege of his employment.

### 2. Was Springdale on Adequate Notice?

Though the Court need not move to the next step in the prima facie case, it writes on to create a complete record on summary judgment, and will now address the issue of whether Springdale received legally adequate notice of Mr. Aaron's complaints will now be addressed. The parties agree that none of the alleged harassers were Mr. Aaron's supervisors. *See* Doc. 24-1, pp. 15, 30; Doc. 24, pp. 27, 28. When it is undisputed that the harassers were employees, rather than supervisors, the Eighth Circuit requires the plaintiff to prove a fifth prima facie element in his hostile work environment claim: that his employer knew or should have known about the harassment and failed to take proper action. *Sallis*, 408 F.3d at 476.

Once an employer is on notice of harassment, it must respond "with prompt remedial action calculated to end it," to avoid liability for the harassment. *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 421 (8th Cir. 2010). In interpreting what constitutes prompt remedial action, the Eighth Circuit in *Alvarez v. Des Moines Bolt Supply, Inc.* affirmed the district court's grant of summary judgment to the employer, finding that managers took steps "reasonably calculated to stop the harassment" by suspending the harasser without pay for five days and later transferring him to another department. *Id.* The disciplinary actions in *Alvarez* took place 11 days after the victim in *Alvarez* filed a written report with the company. *Id.* The Court considered this time period reasonable for the employer to spend investigating the matter and taking steps to stop the harassment. The Court explained:

> Although Alvarez was required to tolerate some delay while DMB investigated the complaint and formulated a remedy, DMB's response effectively ended the harassment within a reasonable time. Accordingly, the district court properly granted summary judgment in favor of DMB on Alvarez's discrimination claims based on pre-suspension sexual harassment.

*Id.*

Turning to the case at bar, there are two dates on which Mr. Aaron's supervisors were informed that Mr. Aaron was being subjected to harassing comments. The first date was toward the end of January 2013, when Mr. Flood reported to Mr. Anderson Mr. Harris's "rope around the neck" comment. It is undisputed that Mr. Aaron did not report the comment himself, but that once Mr. Anderson heard about the incident from Mr. Flood, Mr. Anderson reported it to Mr. Goade, who in turn informed the Human Resources and the Mayor. Mr. Aaron does not dispute that Mr. Goade sought him out to discuss the incident

that January, and that Mr. Goade disciplined Mr. Harris by documenting the incident in his personnel file. Mr. Harris was also directed to apologize to Mr. Aaron, which he did, and Mr. Aaron accepted the apology. Finally, Mr. Aaron agrees that Mr. Harris never made a racially-charged comment in the workplace after that, to Mr. Aaron's knowledge. This comment cannot create a triable issue of fact as to whether Springdale failed to take proper action regarding the "rope around the neck" comment. The disciplinary action Springdale took ended the harassment from Mr. Harris.

It appears all the other harassing comments on the list—with the obvious exception of the comments that were made on the day Mr. Aaron quit—were reported to Mr. Aaron's supervisors during a single two-day period, April 2-3, 2014. Until that time, Mr. Aaron concedes that he did not report any of these comments/incidents to a supervisor, nor, it appears, did any other employee. April 2, 2014 was the date that Mr. Flood referred to Mr. Aaron as "this Negro," and Mr. Aaron became upset and asked Mr. Carr if he could take that day off, as well as the next day. Mr. Carr asked Mr. Aaron what had happened, and Mr. Aaron told Mr. Carr about Mr. Flood's use of a racial epithet, directed to him personally. Immediately thereafter, Mr. Carr reported the incident up the chain of command, and Mr. Goade called a meeting the next day with Mr. Aaron's supervisors and Ms. Lewis from Human Resources. *See* Doc. 24-1, p. 16. In Mr. Aaron's deposition, he admitted that, to the best of his recollection, the only time he ever complained to anyone in Human Resources about any of the harassing comments he experienced *after* the "rope around the neck" comment was on April 3, 2014, the day of the supervisors' meeting. *See id.* at 23. The earliest he complained to Mr. Carr, Mr. Anderson, and Mr. Goade about any

of the other racist comments he claims took place in the workplace after the "rope around the neck comment" was on April 3, 2014. *See* Doc. 24, p. 32. Considering these admissions, the only questions remaining on summary judgment on this issue are: (1) whether the supervisors knew or should have known that racial slurs and comments were being made prior to April 2-3, 2014, and (2) whether a genuine, material dispute of fact exists as to whether Springdale had the opportunity to respond and end the harassment, before Mr. Aaron resigned.

As to the first question, Mr. Aaron asserts in conclusory fashion that Springdale had constructive knowledge "of a variety of racist slurs prior to Plaintiff's official report of them . . . ." (Doc. 25, p. 1), claiming that his supervisors "should have known what was occurring" due to the overall pervasiveness of the harassment. It is Mr. Aaron's burden to present evidence that Springdale knew or should have known about the harassment. *Anderson v. Durham D&M, LLC*, 606 F.3d 513, 519 (8th Cir. 2010). This he has failed to do. The record clearly indicates that his supervisors proactively set up a meeting to discuss the "Negro" comment with Mr. Aaron on or about April 2 or 3, 2014, and at that point found out—for the first time, after questioning Mr. Aaron—that Mr. Aaron had been subjected to other examples of racist comments and insults at the workplace. *See* Doc. 24, Response to Defendant's Statement of Facts, p. 13.[6] The notice Mr. Aaron gave to his supervisors on April 2-3 was legally sufficient to advise Springdale of his claim of harassment at the

---

[6] Statement of Fact Number 57: "It was at that meeting [on April 3] that Marcella complained to those assembled (Sam, James, Terry, and Gina) about a number of the incidences for the first time. **RESPONSE:** Admitted".

time; however, Mr. Aaron has failed to set forth any facts that would lead a factfinder to conclude that he provided legally sufficient notice of harassment to his employers prior to April 2-3.

As to the question of whether Springdale had the opportunity to end the harassment, but failed to do so, the Eighth Circuit approaches that analysis by noting "the amount of time between notice of the harassment and any remedial action, the options available to the employer such as employee training sessions [and] disciplinary action taken against the harasser(s), . . . and whether or not the measures ended the harassment." *Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796, 801 (8th Cir. 2003) (internal quotation and citation omitted). "Once a plaintiff makes a submissible case [that management knew of the conduct], the promptness and adequacy of an employer's response will often be a question of fact for the fact-finder to resolve." *See Howard v. Burns Bros., Inc.*, 149 F.3d 835, 841 (8th Cir. 1998).

Although the Court finds that the sufficiency of an employer's response to reports of harassment are most often fact questions that are better left to a jury to decide, in Mr. Aaron's case, the facts are such that no reasonable factfinder could conclude that Springdale had the opportunity to end the harassment after being put on notice on April 2-3, yet failed to do so. Mr. Aaron admits he returned to work on Monday, April 7, 2014, following the April 3 meeting with supervisors. He quit eight days later, on April 15, 2014. In between April 3 and April 15, Mr. Aaron does not dispute that his supervisors investigated his claims, interviewed witnesses, issued a written warning to Mr. Flood, issued a verbal warning to Mr. Burton, and planned and posted notice of a harassment and

diversity training session that was mandatory for all Public Works employees, and that actually occurred on April 16. He further does not dispute that he walked off the job after the "boy" and "thug" comments made by Mr. Sinclair in the break room on April 15, but he also admits that he did not afford Mr. Carr any opportunity to try to address the comments and take any disciplinary action against Mr. Sinclair. *See* Doc. 24, pp. 21-22.

Under these facts, a reasonable jury could not even reach the issue of whether the remedial measures Springdale took to address the harassment were adequate enough to end it. Therefore, Mr. Aaron cannot meet the final element of the prima facie test by demonstrating that his employer knew or should have known about the harassment and failed to take proper action.[7] For these reasons, summary judgment will be granted to Springdale on the hostile work environment claim.

## B. Constructive Discharge

Establishing the existence of a valid hostile work environment claim is a condition precedent to proving that the employee was constructively discharged due to hostile work environment. *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004). In other words, in order to survive summary judgment on constructive discharge, Mr. Aaron must first establish that there is a triable dispute of fact as to whether he was the victim of a hostile work environment. As explained, *supra*, this he has failed to do. Summary judgment is therefore granted to Springdale as to the claim for constructive discharge due to hostile work environment.

---

[7] That said, as of April 16, 2014, the City of Springdale is surely on notice that a culture of racial insensitivity had taken root within the rank and file of its Public Works Department.

## IV. CONCLUSION

In view of the reasoning set forth above, **IT IS ORDERED** that Defendant City of Springdale's Motion for Summary Judgment (Doc. 19) is **GRANTED**, and Plaintiff Marcella Aaron's claims are **DISMISSED WITH PREJUDICE**. Judgment will be entered in favor of Defendant.

**IT IS SO ORDERED** on this 12th day of May, 2017.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE